IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THE GEORGIA ELECTRONIC LIFE   :
SAFETY & SYSTEM ASSOCIATION,   :
INC., et al.   :
                          :     CIVIL ACTION NO.
    Plaintiffs,     :    1:18-CV-1041-AT
                          :
    v.                :
                          :
THE CITY OF SANDY SPRINGS,   :
GEORGIA, et al.   :
                          :
    Defendants.    :

## ORDER

This case arises on a constitutional challenge to a local ordinance passed by the City Council of Sandy Springs ("the City"), a municipality in Fulton County. The ordinance provides that the City may impose civil penalties against alarm companies for false alarms to summon public safety departments in Sandy Springs. Plaintiffs, two alarm companies and their representative trade association, assert claims for violations of: 42 U.S.C. § 1983 for the deprivation of substantive and procedural due process rights established in the Georgia and United States Constitutions; and O.C.G.A. § 36-33-4, which establishes personal liability for municipal government actors. In addition, Plaintiffs ask the Court for preliminary and permanent injunctive relief, declaratory relief, and attorney's fees. Defendants filed the instant motion to dismiss all claims [Doc. 20]. For the reasons set forth below, the Court **GRANTS** Defendants' Motion.

## I.     FACTUAL AND PROCEDURAL BACKGROUND[1]

As noted above, Plaintiffs in this action are two alarm companies and their representative trade association.  The Georgia Electronic Life Safety & System Association, Inc. ("GELSSA") is a non-profit trade association that represents the state-wide interests of companies that provide electronic security and fire safety services to businesses and citizens throughout Georgia. (Am. Compl. ¶ 1.)  The two alarm company plaintiffs – Safecom Security Solutions, Inc. ("Safecom") and A-Com Security Company LLLP ("A-Com") — are members of GELSSA and serve customers throughout Georgia, including in Sandy Springs. (*Id.* ¶¶ 2-3.) Defendants are the City of Sandy Springs, Mayor Russell Paul, City Manager John McDonough, and individual members of the City Council. (*Id.* ¶¶ 4-7.)

**The Security Alarm Industry**:

In Sandy Springs, between 10,000-11,000 alarm systems are installed in private residences, apartment complexes, churches, schools, commercial establishments, and government buildings throughout the City. (*Id.* ¶ 12.)  When an alarm sensor is triggered at one of these various sites, an electronic signal is transmitted to a communication center, operated by the alarm company or an

---

[1] The Court derives the factual background herein from Plaintiffs' Amended Complaint, which the Court presumes true for purposes of resolving Defendants' Motion to Dismiss.  *See Duke v. Cleland*, 5 F.3d, 1399, 1402 (11th Cir. 1993).  The Court also considers the text of the challenged Ordinance and Resolution. *La Grasta v. First Union Sec., Inc.,* 358 F.3d 840, 845 (11th Cir. 2004) (explaining that, in analyzing the sufficiency of the complaint, a court should limit its consideration to "the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed.").  *See also Trustmark Ins. Co. v. ESLU, Inc.*, 153 F.Supp.2d 1322, 1325 (M.D. Fla. 2001) *aff'd*, 299 F.3d 1265 (11th Cir. 2002) (holding that a court may look beyond the pleadings to consider matters of public record in ruling on a motion to dismiss).

alarm monitoring service with which the alarm company has contracted. (*Id.* ¶ 13.) After receiving the electronic signal, the alarm company attempts to contact the alarm user to verify whether an alarm was caused by an unauthorized intrusion and thus determine whether a response from public authority is needed. (*Id.* ¶ 14.)

Pursuant to a Georgia law that went into effect in 2013, all alarm companies are required to implement "enhanced verification" procedures. (*Id.* ¶ 15) (citing O.C.G.A. § 35-1-9.)  Specifically, upon receiving notice that an alarm has been triggered, an alarm company must (1) call the site or alarm user, and if unsuccessful, (2) call a second person to attempt to verify the alarm, before dispatching the police. (*Id.*)

Generally, when an alarm is triggered, alarm companies pursue established protocols for verification, customized to the security needs of the alarm user. (*Id.* ¶ 18.)  However, beyond attempted verification, an alarm company has no available means of ascertaining whether an alarm activation was the result of criminal activity, other emergency, or alarm user error. (*Id.* ¶ 19.)  As alarm systems are owned or leased and controlled by the user, alarm companies are not able to supervise, direct, or control their customer's actions. (*Id.* ¶ 17.)

Under some circumstances, police may similarly be unable to determine whether an alarm has been activated by an attempted crime.  In certain instances, attempted crimes may be thwarted by the triggering of an alarm, and thus responding police officers may arrive on scene and find no evidence of a crime. (*Id.*

¶ 22.)  As a result, police may be unable to differentiate between a true alarm and a false alarm. (*Id.* ¶ 26.)

**The Ordinance**

In July 2017, the City, acting through the City Council Defendants, enacted Ordinance No. 2017-07-15 ("the Ordinance") and Resolution No. 2017-07-99 ("the Resolution") amending the Code of the City of Sandy Springs. (*Id.* ¶ 28.)  The Ordinance "governs alarm systems intended to summon a public safety department and requires registration, assessment of fees for excessive false alarms, provides procedures for repeat offenders, [and] provides for the severability of the parts [t]hereof if declared invalid . . . ." (*Id.* ¶ 29) (quoting Doc. 18-1, Pl. Ex. 1, the Ordinance Sec. 18-35(b).)

The Ordinance's stated purpose is to "encourage alarm owners and alarm companies to properly use and maintain the operational effectiveness of alarm systems in order to improve the reliability of alarm systems and reduce or eliminate false alarms." (*Id.* ¶ 30; Ordinance Sec. 18-34(a).)  The Ordinance further provides that excessive false alarms burden Sandy Springs police and fire departments and waste public resources. (*Id.*)  The Resolution details this burden, explaining that there were 974 false fire alarms and 9,292 false police alarm calls in 2016, costing the City roughly $657,450 and $117,943 respectively. (Doc. 18-2, Pl. Ex. 2, Resolution at 1.)

Specifically at issue in this litigation is the portion of the Ordinance that authorizes the City to impose a system of fines against alarm companies for

excessive false alarms by alarm users. (Am. Compl. ¶ 29.) "False Alarm" is defined

under the Ordinance as:

> [T]he activation of an alarm system to summon a public safety
> department that results in: (a) an inspection by a public safety
> department that indicates no fire, medical emergency, unauthorized
> entry, robbery, or other such crime was committed, occurred or
> attempted in or on the premises which would have activated a
> properly functioning alarm system; or (b) the cancellation of a request
> to summon a public safety department due to no emergency situation
> at the alarm site requiring a response. . . .

(*Id.* ¶ 33; Ordinance Sec. 18-35.)  To enforce this provision of the Ordinance, the

City has designated a private entity known as "Cry Wolf Services" as the "alarm

administrator," tasked with implementing, administering, controlling, and

reviewing false alarm reduction efforts. (Am. Compl. ¶¶ 34-35.)  Cry Wolf Services

has unilateral discretion in determining whether an activated alarm qualifies as a

false alarm under the Ordinance. (*Id.* ¶ 36.)

Under the Ordinance, Cry Wolf Services may impose civil penalties against

alarm companies "for each false alarm to summon the police [or fire] department

within any twenty-four month period . . . in amounts established by resolution of

city council." (*Id.* ¶ 37; Ordinance Sec. 18-41(a)(1)-(b)(1).) The Resolution sets out

the following specific civil penalty amounts:

> Penalties against the Alarm Company for False Alarms to Summon
> Police or Fire Department within any twenty-four (24) month period:
>
> | | | |
> |---|---|---|
> | (a) | First False Alarm | $25 |
> | (b) | Second and Third False Alarm | $250 each |
> | (c) | Fourth and over False Alarm | $500 |

(Am. Compl. ¶ 40; Resolution at 1.)  In addition to charging fines for false alarms, the Ordinance includes a "Termination Provision."  This Provision provides that "[p]ublic safety departments will not respond to an activated alarm system at an alarm site following the fourth false alarm. . . within any twenty-four (24) month period." (Am. Compl. ¶ 39; Ordinance Sec. 18-41(c).)  The suspension period after the fourth false alarms extends one calendar year, beginning on the date the determination is made to suspend public safety response to a particular site. (*Id.*) After dispatch services to a site have been terminated under the above provision, the City may continue to impose fines on an alarm company for additional false alarms from that site. (Am. Compl. ¶ 41.)  However, the Ordinance allows hearing officers discretion to reduce or dismiss civil penalties when warranted, and to identify critical or high-risk locations not subject to automatic suspension for false alarms when it would be detrimental to the safety of the public. (Ordinance Sec. 18-41(c) - Sec. 18-44(a).)

In addition to establishing a penalty scheme, the Ordinance contains an Appeals section, which outlines the procedural steps necessary to challenge assessments of civil penalties levied for false alarms.  (Am. Compl. ¶ 42; Ordinance Sec. 18-44(a).)  The Appeals section explains that an alarm company may appeal "by filing a written notice of appeal with the police chief or the fire chief, as applicable within ten days after the date of notification of the assessment of civil penalties or other enforcement decisions." (*Id.*)  If an alarm company fails to file a challenge within ten days of notification, it has waived its right to appeal. (*Id.*)

After an alarm company has filed notice of appeal, the challenge is then sent to a hearing officer from the police or fire department.  This hearing officer is an individual designated by the police chief or fire chief to hear appeals related to their agency. (Am. Compl. ¶ 43; Ordinance Sec. 18-44(a).)  The hearing officer "shall render a decision within five business days and give written notification of his/ her decision." (*Id.*)  The hearing officer's decision is subject to further appeal by the filing another written notice to the respective chief within ten days of the decision of the hearing officer. (Ordinance Sec. 18-44(a).)  The respective chief is the final decisionmaker in any matter. (*Id.*)  Finally, the Appeals section dictates that the decisions of the hearing officer and respective chief are "subject to review by the courts having jurisdiction by proceedings in the nature of a writ of certiorari." (*Id.*)  In the event that an appeal is not upheld, the alarm company is responsible for any enforcement costs incurred by the hearing officer. (Am. Compl. ¶ 45; Ordinance Sec. 18-44(d).)  Pursuant to this Ordinance, Plaintiffs Safecom and A-Com have been assessed $4,075  and $625, respectively, in civil penalties for false alarms. (Am. Compl. ¶¶ 47-48.)

**Plaintiffs' Claims:**

GELSSA, Safecom, and A-Com ("Plaintiffs") first bring claims for substantive due process violations under the United States and Georgia constitutions against the City, the Mayor, and the City Manager (Counts I and III). Essentially, Plaintiffs allege that the true purpose of the Ordinance is to generate revenue, which does not relate to a legitimate government interest in the public

health, safety, or general welfare of the City. (Am. Compl. ¶¶ 62-63.)  In addition, they claim that the civil penalty scheme is unreasonable, arbitrary, and lacks any real relationship to the Ordinance's stated purpose. (*Id.* ¶¶ 64, 67.)

In Counts II and IV, Plaintiffs allege that the City, the Mayor, and the City Manager violated Plaintiffs' procedural due process rights under the United States Constitution and the Georgia Constitution.   Here, Plaintiffs challenge the procedure related to the civil penalty determination and the "meaningless" appeals process. (*Id.* ¶¶ 71-82.)

Plaintiffs next pursue a claim against the Mayor, the City manager and the City Council defendants under O.C.G.A § 36-33-4, which establishes personal liability for council members and other municipal officers (Count V).  Plaintiffs allege that these Defendants, in passing and enforcing the Ordinance, engaged in official acts oppressively, maliciously, corruptly, or without authority of law. (*Id.*¶ 124.)

In Count VI, Plaintiffs allege a claim under 42 U.S.C. § 1983 for Fourteenth Amendment violations by the City, the Mayor, and the City Manager, in relation to the above constitutional claims.[2] (*Id.* ¶¶ 129-134.)   Finally, Plaintiffs ask for preliminary and permanent injunctive relief (Count VII), as well as for attorney's fees (Count VIII).

---

[2] Although they have pled it as a separate count in the Complaint, Plaintiffs' § 1983 claim is duplicative of their  constitutional due process claims. By its plain terms, Section 1983 does not itself create any substantive rights, but instead provides a method for redress for the deprivation of rights established elsewhere in the Constitution or federal laws. *See Barfield v Brierton*, 883 F.2d 923, 934 (11th Cir. 1989).

Plaintiffs filed an initial complaint on March 12, 2018. (Doc. 1.)   This complaint included additional claims alleging that the City, the Mayor, and the City Manager exceeded the municipal tax power under the Georgia Constitution and had violated O.C.G.A. § 35-1-9(c), a statute concerning alarm verification requirements. (Doc. 1.)   In response, Defendants filed their first motion to dismiss for failure to state a claim. (Doc. 9.) Plaintiffs then filed an Amended Complaint which omitted the municipal tax power and alarm verification statutory claims. Defendants have filed a second motion to dismiss (Doc. 20), now before the Court.

## II.   STANDARD FOR MOTION TO DISMISS

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   For the purposes of a motion to dismiss, the court must accept all factual allegations in the complaint as true; however, the court is not bound to accept as true a legal conclusion couched as a factual allegation. *Twombly*, 550 U.S. at 555.   "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."   *Iqbal*, at 679.   Although the plaintiff is not required to provide "detailed factual allegations" to survive dismissal, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Twombly*, 550 U.S. at 555, 570; *Iqbal*, 556 U.S. at 678.

## III.   ANALYSIS

### A.   Substantive Due Process (Counts I and III)

The Court first addresses Plaintiffs' substantive due process claims under the United States and Georgia constitutions.  Defendants argue that these claims fail because the Ordinance passes rational basis review. (Mot. to Dismiss at 4-5.) Specifically, Defendants argue that the Ordinance was passed for the legitimate purposes of offsetting costs of false alarms, deterring future false alarms, and ensuring that the City's limited emergency services would be directed towards situations that actually warrant a response. (*Id.* at 5.)   In addition, the City contends that it has a plausible basis to believe that the Ordinance's penalty scheme will further the above legitimate objectives. (*Id.* at 10.)

In opposition, Plaintiffs argue that the Ordinance and Resolution are not rationally related to a legitimate government purpose because (1) the true purpose of the Ordinance is to generate revenue which is not a legitimate interest and (2) there is no "responsible relation" between the regulated entity (the alarm companies) and the prohibited act (generating false alarms). (Pl. Resp., Doc. 21 at 6-12.)

The Court addresses Plaintiffs' substantive due process claims together, as the analysis under the U.S. Constitution is consistent with that of the Georgia Constitution. *BFI Waste Sys. of N. Am. v. Dekalb Cty., Georgia*, 303 F. Supp. 2d 1335, 1349 (N.D. Ga. 2004) (Story, J.); *Ga. Dep't of Human Res. v. Sweat*, 580 S.E.2d 206, 210 (Ga. 2003).  Both parties agree that rational basis review is the

applicable standard to determine the constitutionality of the City's Ordinance. (Mot. to Dismiss at 4; Pl. Resp. at 4.)

Substantive due process challenges that do not implicate fundamental rights are reviewed under the rational basis test. *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 945 (11th Cir. 2013) ("When a challenged law does not infringe upon a fundamental right, we review substantive due process challenges under a rational basis standard.")  Under the rational basis standard, a law will be upheld on a substantive due process challenge "so long as there is any reasonably conceivable state of facts that could provide a rational basis for [the law]." *Fresenius*, 704 F.3d at 945 (quoting *FCC v. Beach Commmc'ns, Inc.*, 508 U.S. 307, 313-15 (1993)) (and finding that a Florida law prohibiting physician self-referrals was rationally related to goals of reducing conflicts of interest and lowering healthcare costs). *See also Ketner v. City of Sanibel*, 750 F.3d 1274, 1281 (11th Cir. 2014) (holding that municipal ordinance prohibiting riparian property owners from building boat docks was rationally related to goals of preserving seagrass and aesthetic preservation, and recognizing the Fourth Circuit's holding that "deprivation of a property interest violates a plaintiff's due process rights if it was clearly arbitrary and unreasonable, with no substantial relationship to a legitimate governmental purpose") (quoting *A Helping Hand, LLC v. Balt. Cty., Md.*, 356 F.3d 372-73 (4th Cir. 2008)).

"Under rational basis scrutiny, governments are not required to convince the courts of the correctness of their legislative judgments." *City of Sanibel*, 750 F.3d

at 1281 (citing *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981)). The rational basis standard is "highly deferential" and the courts hold legislative acts unconstitutional under this standard only in the most exceptional of circumstances. *Id.* In accordance with this deferential standard, legislative acts are afforded a "presumption of validity." *Blue Martin Kendall, LLC v. Miami Dade Cty. Fla.*, 816 F.3d 1343, 1350-51 (11th Cir. 2016) (citations omitted).

When applying the rational basis test, courts conduct a two-step analysis. *Joel v. City of Orlando*, 232 F.3d 1353, 1358 (11th Cir. 2000).[3] "The first step in determining whether legislation survives rational-basis scrutiny is identifying a legitimate government purpose — a goal — which the enacting body could have been pursuing. The actual motivations of the enacting governmental body are entirely irrelevant. . . ." *Id.* (quoting *Havens v. City of Miami*, 52 F.3d 918, 921-22 (11th Cir. 1995)). The second step then asks whether a rational basis exists for the governing body to believe that the legislation would further the hypothesized purpose. *Id.*

Upon applying the first step of the rational basis test to the present case, the Court concludes that the City, in passing the Ordinance, was pursuing a legitimate government purpose. The purpose of the Ordinance is clearly laid out in its text, which states that, "the purpose of this division is to encourage alarm owners and

---

[3] The court in *Joel* applied the rational basis test to an equal protection claim challenging the constitutionality of a local ordinance. The rational basis analysis applied to equal protection challenges that do not implicate fundamental rights or concern a suspect classification is the same as the rational basis analysis used for most substantive due process claims. *Schwarz v. Kogan*, 132 F.3d 1387, 1393 (11th Cir. 1998).

alarm companies to properly use and maintain the operational effectiveness of alarm systems in order to improve the reliability of alarm systems and reduce or eliminate false alarms.  The City of Sandy Springs finds that excessive false alarms unduly burden the Sandy Springs police and fire-rescue departments and wastes limited public safety resources." (Ordinance Sec. 18-34(a).)

The stated purpose of the Ordinance is further supported by the Resolution, which details the costs of responding to false alarms.  In particular, the Resolution indicates that, in 2016, there were 9,292 false police alarms that cost the department roughly 4,424 man hours, totaling approximately $117,943. (Resolution at 1.)  Logically, such expenses of time and money detract from the City's ability to respond when truly needed.  The fact that the Ordinance raises revenue or that the City uses a contractor to administer the civil penalties does not invalidate the legitimate goal of decreasing false alarms for the benefit of the City's citizens, particularly in light of the deferential standard discussed above.

Plaintiffs suggest that two portions of the Ordinance do not serve its stated purposes and that the true objective of these portions is simply to generate revenue, which is not a legitimate government purpose. (Pl. Resp. at 6-7.) Plaintiffs first argue that the Ordinance allows the City to fine an alarm company where the company has quickly cancelled a request and no emergency services have yet been dispatched. (*Id.* at 7.)  But, in the situation where an alarm company has quickly cancelled a prior request with the City *before emergency services have been dispatched*, the text of the Ordinance indicates that the company will not be

charged.   The Ordinance defines a "false alarm" as, in relevant part, "the cancellation of a request to summon a public safety department due to no emergency situation at the alarm site requiring response." (Ordinance Sec. 18-35.) Relatedly, the Ordinance defines "cancellation" as "*the process by which a response is terminated* when the alarm company notifies the emergency communications center that there is not an existing situation at the alarm site requiring public safety department response after an alarm dispatch request." (*Id.*) (emphasis added.)   Reading these two definitions together, it is apparent that a request can only be "cancelled" after a response is terminated.  A response can only be "terminated" if it has already begun.   Therefore, a "false alarm" based on a cancellation does not occur unless the City has already dispatched a response.

The second portion of the Ordinance that Plaintiffs challenge is the portion that allows the City to continue fining alarm companies after the fourth false alarm at a particular site, where the City has suspended services to that site. (Pl. Resp. at 7-8.)  Plaintiffs argue that this "Termination Provision" similarly lacks a legitimate purpose and was included simply to generate revenue. (*Id.*)

This "Termination Provision" involves two basic ideas: first that services be suspended to residents of the City, and second that alarm companies be fined when no services are dispatched.  The Court is concerned by the first basic premise of the "Termination Provision," that is, that services may be suspended to City residents in true need of immediate emergency assistance.  A denial of meaningful access to emergency public serves might, under some circumstances, infringe on the rights

of individual citizens regardless of the number of prior false alarms.  The rights of City residents, however, is not presently before the Court, and Plaintiffs' "Termination Provision" challenge focuses on the assessing of fines against Plaintiff alarm companies.  Plaintiffs do not argue that the "Termination Provision" is unconstitutional because it inhibits residents' access to emergency services. Indeed, it is unclear whether Plaintiffs would have the requisite standing to support any claim regarding a violation of residents' due process rights under the circumstances.

The Court finds that charging alarm companies after a fourth false alarm does not offend Plaintiffs' substantive due process rights for lack of legitimate purpose.  Ultimately, this Provision is not at odds with the stated purposes of "encouraging alarm owners and alarm companies to properly use and maintain the operational effectiveness of alarm systems" to reduce false alarms. (Ordinance Sec. 18-34.)  This "encouragement" occurs regardless of whether emergency services are dispatched.   As Defendants argue, the City sought to encourage alarm companies to better train users, to raise prices for users responsible for high numbers of false alarms, or to decide which users to continue servicing. (Mot. to Dismiss at 9; Def. Reply at 4.)  Passing on the costs to users might then encourage users to operate their alarm systems more carefully to avoid increased charges for false alarms. (Def. Reply at 4.)  Although not all of these purposes are explicitly stated in the Ordinance, as long as "the enacting body *could have been* pursuing"

a legitimate goal, the first prong of the rational basis test is satisfied. *Joel*, 232 F.3d at 1358. (emphasis added).

With respect to the second step of the rational basis analysis, Plaintiffs argue that even if the civil penalty scheme were to promote a legitimate government interest, the Ordinance still fails because it holds alarm *companies* liable for acts or omissions of alarm *users*.  As alarm companies have no "responsible relation" to these alarm users, the civil penalty scheme is not rationally related to the Ordinance's purported purpose. (Pl. Reply at 8.)  Specifically, Plaintiffs argue that a "responsible relation" between the regulated entity and the prohibited act is required in order for the Ordinance to pass rational basis scrutiny. (*Id.*)

The Court disagrees.  Plaintiffs incorrectly apply the "responsible relation" principle to the facts and circumstances at issue in this case.  The "responsible relation" principle arises in the context of "public welfare crimes"[4] and dictates that a defendant is in a "responsible relation," and can therefore be criminally liable, if he has the power to prevent violations from occurring. *See e.g. Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1367 (11th Cir. 1999) (finding that local ordinance making owners of adult entertainment establishments criminally liable for acts of their employees violated due process because "criminal liability based on *respondeat superior* is acceptable if the defendant is in a 'responsible relation'

---

[4] The Eleventh Circuit has defined "public welfare crimes" as "offenses [that] are not crimes in the traditional sense; instead, they are a means of regulating activities that pose a special risk to the public health or safety." *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1367 (11th Cir. 1999).

to the unlawful conduct or omission, but only if the penalty does not involve imprisonment"); *Blue Moon Enterprises, Inc. v. Pinellas Cty. Dep't. of Consumer Protection*, 97 F. Supp. 1134, 1146 (M.D. Fla. 2000) (holding that county's adult entertainment licensing ordinance violated due process where it imposed criminal penalties, including imprisonment, without proof of blameworthiness more than a "responsible relation").

Plaintiffs' "responsible relation" argument, and its underlying legal authority, is inapposite for two reasons. First, as Defendants point out, the Eleventh Circuit has discussed this "responsible relation" principle only in cases that involve criminal penalties. *See e.g. Lady J.*, 176 F.3d at 1367 (where ordinance at issue allowed for criminal liability, and punishment for convictions involved fines and/or jail time). Plaintiffs have cited to no binding authority that applies the "responsible relation" analysis to a civil penalty.[5] Here, the Ordinance specifically notes that the fines imposed for false alarms are civil penalties and there is no possibility of imprisonment. (Ordinance Sec. 18-41(a).) The Court is not persuaded by Plaintiff's argument that this civil versus criminal application is a distinction without a difference.

---

[5] Plaintiffs cite *Hudson v. Texas Racing Commission* for the proposition that a responsible relation analysis is applicable in civil cases. 455 F.3d 597 (5th Cir. 2006). First, this decision is not binding authority. Second, it is unclear whether the penalty in *Hudson*, against a horse trainer where his horse tested positive for drugs, was a civil or criminal penalty. Finally, the court in *Hudson* does not indicate that a responsible relation is required, but simply mentions it as a justification for the penalty imposed. *Id.* at 600 ("In areas of activity requiring strong police regulation to protect public interest, strict liability may be imposed on individuals 'otherwise innocent but standing in responsible relation to a public danger.'")

"The distinction between a civil penalty and a criminal penalty is of some constitutional import." *United States v. Ward*, 448 U.S. 242, 248 (1980) (holding that monetary penalty imposed by the Clean Water Act for discharge of oil from drilling facility into tributary of Arkansas River was civil and therefore does not trigger the protections afforded by the Constitution to a criminal defendant). The *Ward* Court further explained that certain procedural protections – protection from self-incrimination, double jeopardy protection, and the standard of proof beyond a reasonable doubt — are limited to criminal defendants and criminal cases. *Id.* (internal citations omitted). *See also Foucha v. Louisiana*, 504 U.S. 71, 93 (1992) (Kennedy, J., dissenting) (noting that criminal cases are afforded "heightened due process scrutiny"). Plaintiffs do not appear to contest that the penalties imposed under the Ordinance are civil penalties. Essentially, Plaintiffs attempt to stretch the concept of "responsible relation" to a situation where it does not apply.

Second, where the responsible relation argument does apply, courts have explained it as a justification for holding one party responsible for another party's actions, rather than a requirement. *See e.g. United States v. Park*, 421 U.S. 658 (1975) (explaining that the president of a national food corporation was criminally liable for the company's rodent infested warehouse *because*, as president, he was in a responsible relation to the unlawful failure to maintain sanitary warehouses) (emphasis added). Plaintiffs have again provided no authority that holds that this "responsible relation" is a constitutional requirement for the imposition of fines in

the form of a civil penalty.[6]   As discussed in the relevant legal authority, a "responsible relation" is a sufficient condition for liability rather than a necessary condition for constitutionality.[7]

As the Court concludes that the existence of a "responsible relation" between the alarm companies and alarm users is not a constitutional requirement, the applicable standard asks whether a rational basis exists for the City to believe that the Ordinance would further the legitimate goals. *Joel*, 232 F.3d at 1358 (internal citations omitted).   As described by Defendants, these goals are: the reduction of false alarms, a reduction in the costs of responding to false alarms, and the availability of resources for situations that merit an emergency response. (*See* Def. Reply at 10.)

The Court finds that the civil penalties are rationally related to Defendants' proposed goals.   In addition to the listed purpose of the Ordinance, Defendants

---

[6] Plaintiffs also cite a Sixth Circuit case, *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557 (6th Cir. 1985).   The Sixth Circuit in this case reviewed the district court's determination that a corporate officer could be held individually liable, and civil penalties could be imposed, for the corporation's violations of the Radiation Control for Health and Safety Act. *Id.*   The Sixth Circuit affirmed the district court's decision, noting that "the rationale for holding corporate officers criminally responsible for acts of the corporation, which could lead to incarceration, is even more persuasive where only civil liability is involved. . . .[t]he fact that a corporate officer could be subjected to criminal punishment upon a showing of a responsible relationship to the acts of a corporation that violate health and safety statutes renders civil liability appropriate as well."  *Id.* at 561.   Thus, the court did not hold that a responsible relation is required before a civil penalty can be imposed.   Instead it intimated that the assessment of a civil penalty was appropriate where the requirements for the charging of a criminal penalty were satisfied. *Id.*

[7] In addition, Defendants argue that even if such a showing is required, a "responsible relation" exists here because alarm companies maintain a close relationship with alarm users after initial installation, as shown by the alarm companies' actions in "installing the systems, monitoring the systems, training the users, maintaining discretion over who they service, and continuing to service users who habitually cause false alarms." (Def. Reply at 9.)   The Court does not reach a conclusion on whether a "responsible relation" exists here, finding instead that the existence of such a relationship is not required for the Ordinance to pass rational basis review.

argue that the City Council may have believed that charging fees against alarm companies would "encourage companies to be vigilant in training users to properly operate alarm systems [,] . . . deter companies from continuing to service users who habitually trigger false alarms," and encourage alarm companies to "charge higher rates for users who frequently cause [] false alarms." (Mot. to Dismiss at 9.) In addition, the City believes that imposing fines against alarm companies "would encourage companies to pass on the costs to their users, who would in turn operate their alarm systems more carefully to avoid increased charges for false alarms." (Def. Reply at 4.)  These concerns illustrate a logical relationship between the civil penalties imposed and the conduct at issue (triggering false alarms), even under circumstances where the alarm company is not directly responsible for a false alarm.

Under the "highly deferential" standard, and in light of the "presumption of validity," Plaintiffs have not shown that the civil penalty scheme was arbitrary and unreasonable, having no substantial relationship to the legitimate purposes of preventing or reducing false alarms and conserving the City's resources in the event of true emergencies.  Defendants' Motion to Dismiss Plaintiffs' substantive due process claims (Counts I and III) is therefore **GRANTED**.

**B.       Procedural Due Process (Counts II and IV)**

The Court next considers Plaintiffs' procedural due process claims under the Georgia and United States constitutions.[8]  Defendants argue for dismissal on the grounds that Plaintiffs lack standing to challenge the Ordinance where they have not alleged facts to show that their injury was caused by an allegedly unconstitutional procedure. (Mot. to Dismiss at 15.) "While [Plaintiffs] allege that the ordinance's hearing and appeals procedures are inadequate to remedy that erroneous deprivation, they have not and cannot allege that they ever utilized those procedures." (*Id.*)

Plaintiffs first argue that that have standing to pursue a procedural due process claim because they are "not required to exhaust" the appellate process. (Pl. Resp. at 14.)  They then contend that the Ordinance does not satisfy due process requirements because it does not provide adequate procedural safeguards for the deprivation of Plaintiffs' property where the Ordinance affords no meaningful opportunity to challenge the penalties charged. (*Id.* at 16.)

To establish standing, a plaintiff must show: (1) injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Here, Plaintiffs are able to establish an injury in fact (the civil penalties assessed against them), as well as show that the

---

[8] As with the substantive due process claims, the Court views the procedural due process claims together, as the analysis under the Georgia and United States constitutions is the same. *Schumacher v. City of Roswell*, 344 Ga. App. 135, 138 (Ga. Ct. App. 2017).

injury could be redressed by a favorable decision in the form of damages or an injunction.  At issue is whether Plaintiffs can show a causal connection between the injury and the conduct complained of where they cannot show that they ever used the statutory procedures available to challenge the fee assessed against them.

This issue presents a circuit split.  The Sixth and Fourth Circuits[9] have held that a plaintiff lacks standing to bring a procedural due process claim where the plaintiff receives a fine and opts to pay the fine rather than challenge the fine through the statutory process. *See Herrada v. City of Detroit*, 275 F.3d 553, 558 (6th Cir. 2001) (holding that plaintiff lacked standing to argue that hearings are not held despite requests by vehicle owners because she elected to pay traffic fine, issued pursuant to traffic camera citation system, rather than request hearing); *Clark v. Humane Soc. of Carroll Cnty., Inc.*, 2011 WL 2791041 at *6 (D. Md. July 13, 2011) *aff'd*, 468 F. App'x 342 (4th Cir. 2012) (explaining that courts have consistently held that, where an individual elects to pay a civil fine and thus avoid the procedures provided to contest the alleged violation, that individual lacks standing to challenge the procedures they did not use).

On the other hand, the Eighth Circuit has held that plaintiffs who receive citations have standing to challenge procedures for contesting those citations, even if they have not utilized those procedures. *Hughes v. City of Cedar Rapids, Iowa*, 840 F.3d 987 (8th Cir. 2016).  While the Eighth Circuit does not address the Sixth

---

[9] The Fourth Circuit affirmed the district court's determination that the plaintiff's Fourteenth Amendment claim was "properly dismissed because Appellants lack standing to raise it." *Clarke v. Humane Soc. of Carroll Cnty., Inc.*, 468 F. App'x 342 (4th Cir. 2012).

Circuit authority on this issue, the court in *Hughes* found that "allegations that the procedure is inadequate – even if drivers shun it — sufficiently establishes an injury in fact for Article III standing." *Id.*

Although the Eleventh Circuit has not weighed in, district courts in this Circuit have held that a plaintiff must attempt to use the challenged procedures in order to have standing to raise a due process claim. *See Stubbs v. City of Ctr. Point, Ala.*, 988 F. Supp.2d 1270, 1277-78 (N.D. Ala. 2013) ("[W]hile payment of the fine could be considered an injury, Ms. Stubbs' injury is not causally connected to the conduct of which she complains because she paid her fine without taking advantage of the process provided by the City to challenge it.  Even if that process were insufficient to satisfy constitutional standards, it did not cause Ms. Stubbs to voluntarily pay her fine; no traceable connection exists."); *Worthy v. City of Phenix City, Ala.*, 2017 WL 4478333 (M.D. Ala. Oct. 6, 2017).  The district court in *Worthy* agreed with the Sixth's Circuit's approach because "[t]he Eighth Circuit's approach suffers from a flawed premise — that inadequate process, by itself, is an injury capable of conferring standing." *Id.* 2017 WL 447833 at *4.  The court in *Worthy* relied on established Supreme Court precedent that "[p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Id.* (citing *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983)).[10]

---

[10] District courts in other circuits have similarly followed suit. *See Van Harken v. City of Chicago*, 906 F. Supp. 1182, 1187 (N.D. Ill. 1995) (finding that class action challenging city parking ordinance should not include individuals who paid rather than contested their parking tickets

This Court agrees with the district courts in *Stubbs* and *Worthy*, following the Sixth Circuit's approach.  In the context of a procedural due process claim, the Supreme Court has explained that "the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in and of itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (internal citations omitted) (emphasis in original).  Here, the Court cannot determine what process was provided, or whether it was constitutionally adequate, with respect to the Plaintiffs' allegations. As noted in the above Factual Background, the Ordinance establishes an appeals process for those who seek to challenge an assessment of civil penalties.  This appeals process involves the filing of a written notice of appeal, review by an appointed "hearing officer," a potential second appeal of the hearing officer's decision, and review by the state courts via a writ of certiorari. (Ordinance Sec. 18-44(a).)

Plaintiffs have not alleged in their Amended Complaint that they ever attempted to engage in the appeals process the Ordinance provides.  Nor have Plaintiffs alleged facts indicating the futility and inadequacy of the appeals process

because  "they have waived their opportunity to utilize the review procedures that they would now challenge"); *Shavitz v. City of High Point*, 270 F. Supp. 2d 702, 710 (M.D. N.C. July 9, 2003) (finding that because motorist, who received citation for red light violation detected by cameras at intersection, failed to use the process provided to him, he could not show that he had suffered injury because of the insufficiency of the process provided, and therefore lacked standing to raise procedural due process challenge to statute and ordinance); *Mills v. City of Springfield, Mo.*, 2010 WL 3526208 at *6 (W.D. Mo. Sept. 3, 2010) (finding that the court need not determine the constitutionality of the city's procedures because plaintiffs did not have standing to challenge procedures they declined to use).

based on the actual experience of other alarm companies providing services in Sandy Springs that have pursued appeals.  Absent such allegations, Plaintiffs have failed to demonstrate the basic standing requirement of causation between their own injury and the challenged procedural deficiencies to support a due process claim.  Thus, while payment of the fine could be considered an injury, it cannot be determined that Plaintiffs' injuries are causally connected to the "inadequacy of the post-penalty remedies" they complain of. (Pl. Resp. at 15.)  The legal authority upon which Plaintiffs rely further supports this conclusion.  *See e.g. Granite State Outdoor Advert., Inc. v. City of Clearwater, Fla.*, 351 F.3d 1112, 1117-1118 (11th Cir. 2003) (holding that plaintiff did not have standing to challenge the city's code where plaintiff did not allege how the city's permitting and appeals procedure injured plaintiff).  As Plaintiffs have not alleged the necessary element of a causal connection between the injurious civil penalties imposed on Plaintiffs and the appellate process of which they complain, they have not established the requisite standing to bring their procedural due process claim.

Plaintiffs' argument that they are "not required to exhaust" the appellate process before bringing procedural due process claims misconstrues the above standing component.  While it is true that Plaintiffs are not required to exhaust state administrative remedies to state a § 1983 claim,[11] the existence of state remedies "*is* relevant in a special sense" in a § 1983 action for a procedural due process violation.  *Zinermon*, 494 U.S. at 125-26.   In this context, "[t]he

---

[11] *See Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 500-01 (1982).

constitutional violation under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Id.* at 126. "When a state procedure is inadequate, no procedural due process right has been violated unless and until the state fails to remedy that inadequacy." *McKinney v. Pate*, 20 F.3d 1550, 1560 (11th Cir. 1994) (finding that "even if McKinney suffered a procedural *deprivation* at the hands of a biased Board at his termination hearing, he has not suffered a *violation* of his procedural due process rights unless and until the State of Florida refuses to make available a means to remedy the deprivation") (emphasis in original).  This rule "looks to the existence of an opportunity – to whether the state courts, if asked, generally would provide an adequate remedy for the procedural deprivation the federal court plaintiff claims to have suffered." *Horton v. Bd. of Cty. Comm'rs of Flagler Cty.*, 202 F.3d 1297, 1300 (11th Cir. 2000).  And, the rule is not based on ripeness or exhaustion principles," but "on a recognition that the process a state provides is not only that employed by the board, agency, or other governmental entity whose action is in question, but also includes the remedial process state courts would provide if asked." (*Id.*) (citing *McKinney*, 20 F. 3d at 1561-65).

Plaintiffs argue that an appeal to state courts via a petition for writ of certiorari is not actually available, despite being expressly provided for in the Ordinance as part of the appeals process. (Pl. Resp. at 19-21.)  Specifically, Plaintiffs argue that whether a writ of certiorari is issued depends in part on whether a hearing officer whose decision is being reviewed is determined to be

exercising quasi-judicial powers or merely administrative functions.   Here, Plaintiffs contend that the designated hearing officers are exercising administrative functions, and therefore no writ is available. (*Id.* at 21.)  Defendants disagree and assert that the hearing officers are exercising quasi-judicial functions because decisions of the officers: involve an individualized assessment of a specific set of facts, are immediate in application, involve a hearing, involve notice to the aggrieved party, and include a written decision. (Mot. to Dismiss at 18-19.)

The writ of certiorari is an available remedy "for the correction of errors committed by any inferior judicatory or any person exercising judicial powers." O.C.G.A. § 5–4–1(a).  Any party in a case "in any inferior judicatory or before any person exercising judicial powers" who is "dissatisfied with the decision" may "apply for and obtain a writ of certiorari" by filing a petition in superior court. O.C.G.A. § 5–4–3.  The superior court must decide whether it can properly hear a petition for certiorari by first determining whether the petition is seeking review of a judicial or quasi-judicial action or merely an administrative one. *E.g. Goddard v. City of Albany*, 684 S.E.2d 635, 638 (Ga. 2009); *Laskar v. Board of Regents of University of Georgia*, 740 S.E.2d 179, 181 (Ga. Ct. App. 2013).   In deciding whether it has subject matter jurisdiction over a petition for writ of certiorari, the court "must focus on the function of the hearing officer and the process used to determine whether they were quasi-judicial or administrative in nature." *E.g., Mack II v. City of Atlanta*, 489 S.E.2d 357, 417 (Ga. Ct. App. 1997).  The difference between an administrative function and a judicial/quasi-judicial function

generally turns on whether the parties were granted notice and the opportunity to be heard. *Goddard v. City of Albany*, 684 S.E.2d 635, 638 (Ga. 2009). The courts also consider whether the hearing officer "was then required to examine and weigh the evidence and make a decision according to the law — to exercise discretion and judgment in application of the law ... to a particular set of facts." *Laskar*, 740 S.E.2d at 182 (quoting *Rozier v. Mayor and Aldermen of the City of Savannah*, 712 S.E.2d 596, 598 (Ga. Ct. App. 2011) (petition for certiorari proper where hearing officer applied city beverage ordinance to facts) (citation and punctuation omitted); *Mack II*, 489 S.E.2d at 360-61 (petition of certiorari proper for review of hearing officer's quasi-judicial function in applying legal standards of res judicata and collateral estoppel to determine whether party entitled to a hearing under city code); *Starnes v. Fulton County School District*, 503 S.E.2d 665, 667 (Ga. Ct. App. 1998) (pension board performed process "akin to a judicial act" where it weighed evidence, assessed witness credibility and applied "fact-intensive" law governing line of duty pensions to facts).

Plaintiffs' conclusory assertions that a writ is unavailable are not enough. Their assertions are nothing more than speculation that a writ of certiorari is unavailable. The Court cannot review the sufficiency of the processes detailed in the Ordinances – such as a potential remedy through either the City's appeals process or through a writ of certiorari — under present circumstances where there has not been an attempt to determine whether any meaningful notice and opportunity to be heard are truly provided or what such a review process looks like

in practice. Plaintiffs have not alleged that they ever attempted to appeal to a state court via a petition for writ of certiorari.  As Plaintiffs have not yet sought and been denied the remedy by the state court much less included specific factual allegations regarding their own experience or that of other comparable alarm companies in the appeal process, they cannot show that their procedural due process rights have been violated.  *McKinney*, 20 F.3d at 1562; *Zinermon*, 494 U.S. at 123.

With more information regarding the processes offered (or not offered) to remedy an unlawful taking of property under the Ordinance, Plaintiffs might be able to demonstrate standing.  But without a specific example of one of the Plaintiffs, or even a similar company, having attempted to utilize the procedures laid out in the Ordinance and being denied process arguably due, any conclusions made by the Court regarding the sufficiency of the procedures offered are completely hypothetical in nature.  Accordingly, Defendants' Motion to Dismiss Plaintiffs' procedural due process claims is **GRANTED**.[12]

## C.   Claims Against Individual Defendants under O.C.G.A. § 36-33-4

In Count V of their Amended Complaint, Plaintiffs bring a claim against the Mayor, the City Manager, and the City Council Defendants under O.C.G.A. § 36-33-4.  This statute, concerning personal liability for municipal officers, provides that: "Members of the council and other officers of a municipal corporation shall

---

[12] Plaintiffs' claims for preliminary and permanent injunctive relief (Count VII) and Attorney's Fees (Count VIII) are contingent upon and tied to their constitutional claims.  As the Court finds that Plaintiffs have not stated any cognizable constitutional claims, the Court **GRANTS** Defendants' Motion to Dismiss Counts VII and VIII.

be personally liable to one who sustains special damages as the result of any official act of such officers if done oppressively, maliciously, corruptly, or without authority of law." O.C.G.A. § 36-33-4.

A federal district court may exercise supplemental jurisdiction over state law claims deriving from a common nucleus of operative fact with a substantial federal claim. 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."); *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966); *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 742-43 (11th Cir. 2006).

District courts are authorized to "decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Eleventh Circuit has noted that if the federal claims are dismissed prior to trial, district courts are strongly encouraged or even required to dismiss any remaining supplemental state claims. *Mergens v. Dreyfoos*, 166 F.3d 1114, 1119 (11th Cir.1999) (quoting *L.A. Draper & Son v. Wheelabrator–Frye, Inc.*, 735 F.2d 414, 428 (11th Cir.1984); *Gibbs*, 383 U.S. at 726. Having dismissed all of Plaintiffs' pending federal claims, the Court

declines to exercise supplemental jurisdiction over Plaintiff's remaining state claim regarding a violation of O.C.G.A. § 36-33-4.[13]

## IV.   CONCLUSION

Based on the above analyses, the Court **GRANTS IN FULL** Defendants' Motion to Dismiss.

**IT IS SO ORDERED** this 12th day of December, 2018.

**AMY TOTENBERG**
**UNITED STATES DISTRICT JUDGE**

---

[13] The parties dedicate multiple pages in their briefs to the issue of whether the Mayor and City Manager are entitled to qualified immunity.  Having dismissed the federal claims against these individual defendants on other grounds, the Court need not address the issue of qualified immunity.